IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

DANIEL ZACHARY HARPER,

        Plaintiff,

      v.

JEFF PREMO, Superintendent OSP;
CORPORAL POLK, OSP Security;
C. PARKER, OSP Security; C. LENEX, OSP
Support Staff; S. DARR, OSP Security;
P. PATTERSON, OSP Security; JOHN DOE,
ICH Legal Officer, individually and in their
official capacities,

        Defendants.

6:13-cv-00097-MO

OPINION AND ORDER

MOSMAN, J.,

      Plaintiff pro se Daniel Harper filed the instant lawsuit on January 17, 2013. (Compl. [2].)

He alleges that while housed at the Oregon State Penitentiary ("OSP"), numerous prison officials

(collectively, "the Defendants") violated his constitutional rights as secured by the Eighth and

Fourteenth Amendments. First, Mr. Harper alleges that Defendants violated his Fourteenth

Amendment right of access to the courts when he was denied access to his legal materials for

twenty-three days, following his transfer to OSP from a different prison on February 2, 2011. *Id.* ¶ 20. Mr. Harper contends that his inability to access his legal materials prevented him from raising eight assignments of error in his direct appeal proceedings, and consequently he is procedurally barred from pursuing those claims in post-conviction relief. *Id.* ¶¶ 20–22. Second, Mr. Harper alleges that he was subjected to cruel and unusual punishment when the Defendants failed to dispense his prescribed fluoxetine[1] from February 2 to February 13, 2011. *Id.* ¶ 23. Mr. Harper alleges that he became suicidal due to withdrawals from the antidepressant, and in fact attempted to commit suicide on February 13, 2011, by biting his wrist. *Id.* ¶ 23. Finally, Mr. Harper alleges that he was subjected to cruel and unusual punishment when two correctional officers, knowing he was suicidal, moved him into an unmonitored cell and ridiculed him. This incident also occurred on February 13, 2011, and allegedly contributed to Mr. Harper's alleged suicide attempt. *Id.* ¶ 23. Mr. Harper seeks declaratory relief and compensatory and punitive damages. *Id.* ¶¶ 26–28. Now before me are dueling motions for summary judgment. Mr. Harper moved for summary judgment [24] prior to discovery, and the Defendants moved for summary judgment [60] on all three claims at the close of discovery. Because I find no genuine issue of material fact that could lead a rational jury to find a constitutional violation, I DENY Mr. Harper's motion for summary judgment and GRANT the Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

## I. <u>The Transfer to OSP and Lack of Access to Legal Work</u>

Mr. Harper was moved to OSP on February 2, 2011. (Etter Decl. [65] ¶ 5.) Upon his arrival, he was assigned to a general population cell in the "D Block," which was under the

---

[1] The generic form of Prozac, an antidepressant.

supervision of Defendant Polk. (Polk Decl. [63] ¶ 4.) Later that same day, Mr. Harper informed Defendant Polk that he could not return to his cell on the D Block because he "could not live where he was assigned," and was thinking about harming himself. *Id.* After confirming that Mr. Harper was indeed refusing to go to his cell, Defendant Polk escorted Mr. Harper to the Disciplinary Segregation Unit ("DSU") and issued him a misconduct report for failing to "cell in." *Id.*

Inmates housed in the DSU are allowed a limited amount of personal property, such as clothing, toiletries, pillows and blankets, paper, and writing utensils. (Etter Decl. [65] Attach. 2 at 10–11.) Inmates that are classified as "short-term status" are also permitted to have 20 envelopes, one library book, one newspaper, three magazines, pending legal work, and an address book. *Id.* at 19. *See also* Or. Admin. R. 291-011-0050 (3)(a)–(g). Mr. Harper was considered a short-term inmate because he was scheduled to be confined to the DSU for less than 30 days, and thus was entitled to his pending legal work and an address book. (Etter Decl. [65] ¶ 7.) According to the DSU Guidelines, inmates are allowed one opportunity to make a property request, with an exception for legal materials necessary for pending legal action, which can be requested at any time. *Id.* Attach. 3 at 1. When the DSU property officer receives a written request for personal materials, the officer will determine whether the property is approved for inmates housed in the DSU. *Id.* ¶ 11.

On February 2, 2011, the day he entered the DSU, Mr. Harper was provided with two blank communication forms and instructions to send written property requests to the DSU property officer. *Id.* ¶ 10. If Mr. Harper had made a verbal request for property, Defendants would have instructed him to make a written request. (Etter Decl. [65] at ¶ 10; Patterson Decl. [64] ¶ 8.)

Mr. Harper delivered his first written request for property on February 9, 2011, to Defendant Lenex. (Etter Decl. [65] Attach. 4 at 1.) Of relevance here, in this written property request, Mr. Harper notified Defendant Lenex that "D.O.C. [Department of Corrections] is keeping my legal property from me." *Id.* The next day, on February 10, Mr. Harper delivered a written property request to Defendant Darr, this time specifying that "I need my direct appeal lawyers [*sic*] information because I have to keep him updated on my current address." *Id.* at 2. Defendant Darr asked Mr. Harper to specify the attorney's name. *Id.*

On February 14, Mr. Harper was transferred from his cell in the DSU to a cell in the Intermediate Care Housing ("ICH") unit.[2] *Id.* Attach. 1 at 3. Apparently, Mr. Harper was not provided the remainder of his property, because on February 15, Mr. Harper sent a written request to Defendant Parker. Mr. Harper said that he needed some envelopes with his attorney's address, because he had not yet been able to notify his attorney of the transfer to OSP, and "[i]t is vital for my appeal attorney to know where I'm at" because "I was transferred here at the end of an important deadline." *Id.* Attach. 4 at 3. Mr. Harper wrote to Defendant Parker again the next day, and again asked about legal materials, though he acknowledges that he had by then received some of his property "from DSU." *Id.* at 4. On February 20, Mr. Harper wrote another request to Defendant Doe, a "legal officer," seeking the return of his legal materials, indicating that he had also tried calling the "Attorney General" for help. *Id.* at 5. In response, Mr. Harper was told that he had been scheduled to meet with a paralegal on February 28. *Id.* Five days later, on February 25, Mr. Harper delivered a succinct "I'd really like to get my property, please" to Defendant Parker. *Id.* at 6. His legal materials were apparently returned that same day. *Id.*

---

[2] Inmates are assigned to the ICH upon referral from a mental health care specialist. *See* Or. Admin. R. 291-048-0270.

## II.    <u>The Incident on February 13, 2011</u>

During his time in the DSU, Mr. Harper was assigned to cell DS-102, located on the first tier of the unit. (Polk Decl. [63] ¶ 6.) On February 13, 2011, Mr. Harper approached Defendant Polk and stated that he intended to hurt himself. *Id.* ¶ 7. Defendant Polk asked Defendant Patterson to assist him in escorting Mr. Harper to an administrative holding area within DSU, after which they would notify the Shift Lieutenant of Mr. Harper's statements. *Id.* After escorting Mr. Harper to the administrative area, Defendants Polk and Patterson briefly stepped into the DSU office in order to call the Shift Lieutenant and report Mr. Harper's threats of self-harm. (Patterson Decl. [64] ¶ 6.) Mr. Harper "seemed to be doing fine sitting in the holding cell." *Id.* Both Defendant Polk and Defendant Patterson deny making antagonizing statements or threats to Mr. Harper, or purposefully placing him in an unmonitored holding cell knowing that he had suicidal ideations. (Polk Decl. [63] ¶¶ 10–11; Patterson Decl. [64] ¶ 9.) Nevertheless, at some point during his time in the holding cell, Mr. Harper attempted suicide by trying to "bite through his artery on his left wrist." (Ruthven Decl. [66] Attach. 2 at 38.) He "only received a superficial abrasion." *Id.* Mr. Harper was then placed in the ICH for "close supervision." *Id.* ¶ 7 & Attach. 1 at 3.

Following the suicide attempt, Mr. Harper met with a psychiatrist, Dr. Ruthven, on February 17, 2011. *Id.* Attach. 2 at 40. Dr. Ruthven's notes from the February 17 assessment reveal that Mr. Harper was still angry about the February 2 misconduct report, issued by Defendant Polk, which resulted in Mr. Harper's transfer to the DSU. *Id.* at 39. Mr. Harper told Dr. Ruthven that he "bit a chunk out of [his] wrist so [he] could bleed and let them know how angry [he] was at [Defendant Polk]." *Id.* Dr. Ruthven noted that Mr. Harper had been placed in the ICH on "suicide close observation status." *Id.* However, Dr. Ruthven felt that Mr. Harper

"will not need ICH level of care for very long. He was not suicidal, he was angry and continues to be angry and anxious." *Id.* Dr. Ruthven also noted "some concern that [Mr. Harper] will utilize BHS [Behavioral Health Sciences] services as a means to avoid consequences of his behavior and this will need to be monitored." *Id.*

## III.    <u>Prescription Medication</u>

While still housed at SRCI, Mr. Harper was prescribed 10 mg/day of the antidepressant fluoxetine, set to increase to 20 mg/day on January 25, 2011. (Ruthven Decl. [66] ¶ 8.) Beginning the day after he arrived at OSP, however, Mr. Harper did not receive his daily fluoxetine for 11 days, from February 3 to February 13. *Id.* ¶ 6. Apparently, Mr. Harper was offered his daily dose of fluoxetine on the morning of February 6, but refused to take the medication. *Id.* ¶ 6.[3] On February 14, 2011, Mr. Harper "received his morning dose [of fluoxetine]," and he also received his morning dose from February 16–28. *Id.* ¶ 6.

As noted above, Dr. Ruthven examined Mr. Harper on February 17. *Id.* ¶ 8. Dr. Ruthven explained that "Mr. Harper reported to me he had no side effects and no perceived benefit from the anti-depressant." *Id.* Although Mr. Harper had not been taking fluoxetine long enough to allow an adequate diagnosis of its potential benefits or negative side effects, Dr. Ruthven "felt it should be continued." *Id.* ¶ 10. Dr. Ruthven notes that "[Mr. Harper] did not mention . . . that he had not been receiving his fluoxetine [after he arrived at OSP]." *Id.* In any event, Dr. Ruthven felt that "Mr. Harper's action [i.e., the suicide attempt] was out of anger rather than a suicide attempt and was not the result of missing his morning dose of *fluoxetine*. The outcome of missing two weeks of *fluoxetine* is minimal and would not create suicidal ideation." *Id.* ¶ 7. Also

---

[3] Dr. Ruthven's declaration states that Mr. Harper refused fluoxetine on the morning of February 6, *2010*, but I assume this is a typo.

during this time, Mr. Harper was receiving a daily dose of amitriptyline to relieve abdominal pains, and apparently received the dosage throughout the month of February. *Id.* ¶ 6; Attach. 2 at 40.

## LEGAL STANDARDS

Summary judgment must be granted in favor of the moving party when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the non-moving party must identify facts that show a genuine issue for trial. *Id.* at 324. The non-moving party cannot meet its own burden by relying on allegations in the complaint, or by relying on "unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). However, the record will be reviewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1280 (9th Cir. 1980). In cases in which a defendant moves for summary judgment against a pro se prisoner, either the court or the movant must provide the prisoner with "fair notice" of the requirements of the summary judgment rule. *See Rand v. Rowland*, 154 F.3d 952, 956–59 (9th Cir. 1998) (affirming and setting out parameters of the fair notice requirement).

In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted. *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Mr. Harper and the Defendants have each moved for summary judgment. I discuss each of their motions in turn.

## I.     Mr. Harper's Motion for Summary Judgment

Mr. Harper filed his motion [24] on July 12, 2013, prior to discovery. Mr. Harper devotes the majority of his brief [26] to contesting the defenses set forth in the Defendants' answer [21], and states that "[t]he Defendants chose not to dispute any of the claims that are outlined in the Complaint; instead, they offer vague defenses that do not apply to this case." (Pl.'s Mem. Supp. [26] at 9.) In light of the "undisputed issues cited within the Complaint," Mr. Harper argues that he is entitled to a grant of summary judgment. *Id.* at 10.

Mr. Harper does not identify the material facts, undisputed by the Defendants, entitling him to judgment as a matter of law. The Defendants' answer [21] raised a number of "affirmative defenses," including statute of limitations and failure to exhaust arguments, and Mr. Harper offers evidence sufficient to defeat some of these defenses.[4] For example, Mr. Harper has submitted evidence that he properly exhausted the administrative grievance process, as required by the 42 U.S.C. § 1997e(a). (Pl.'s Resp. [76] Attach. 6.) Further, Mr. Harper's claim is timely. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (Section 1983 claims borrow limitations period from state-law personal injury claims); *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002) (applying Oregon's two-year personal injury limitations period to § 1983 claim). However, Mr. Harper does not identify undisputed material facts that demonstrate his entitlement to prevail on the merits of his constitutional claims. Mr. Harper essentially restates allegations from his

---

[4] The Defendants concede that four of their defenses are inapplicable to Mr. Harper's claims, including failure to state a claim, "PLRA exhaustion," statute of limitations, and substitution. (Defs.' Resp. [30] at 2.)

complaint, including that "Defendants . . . knew that Plaintiff had a legal deadline, and needed his legal property[,]" that "Plaintiff repeatedly sought his controlled by staff medication for more than 10 consecutive days," and that "Defendants Polk and Patterson left Plaintiff alone and un-monitored after Plaintiff expressed suicidal thoughts to them." (Pl.'s Mem. Supp. [26] at 8–9.)

Pro se litigants' complaints are to be liberally construed. *See, e.g.*, *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007); *Franklin v. Murphy*, 745 F.2d 1221, 1228 (9th Cir. 1984). However, a plaintiff cannot simply rely on the allegations contained in the pleadings to obtain summary judgment in its favor, as "a party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Hernandez*, 343 F.3d at 1112. Because he has not identified undisputed material facts that entitle him to a favorable judgment as a matter of law, Mr. Harper's motion for summary judgment [24] is DENIED.

## II.    <u>Defendants' Motion for Summary Judgment</u>

The Defendants move for summary judgment [61] on all of Mr. Harper's claims. Although Defendants do not explicitly raise a right to qualified immunity in their motion for summary judgment, they have asserted qualified immunity as an affirmative defense in their Answer. (Answer [21] ¶ 14–15; Defs.' Resp. Mot. Strike [57].) Qualified immunity provides government officials immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At the summary judgment stage, the court's inquiry is twofold: I must determine whether the facts shown by the plaintiff "make out a violation of a constitutional right," and whether the right at issue was "clearly established at the time of the defendant's

alleged misconduct." *Id.* at 232 (internal quotations omitted). Defendants argue that no constitutional violation occurred, and have submitted evidence to support that argument. As discussed below, I find that Defendants' conduct did not violate Mr. Harper's constitutional rights. Therefore, I need not consider whether any of the rights allegedly violated were clearly established in February 2011, when the events at issue took place.

Defendants argue that the undisputed facts demonstrate: (1) there was no delay in allowing Mr. Harper access to his legal material, and even if there was some short delay, Mr. Harper has presented no evidence that the delay affected his ability to raise the eight assignments of error on direct appeal;[5] (2) that neither Defendant Polk nor Defendant Patterson ridiculed or antagonized Mr. Harper, and did not subject him to cruel and unusual punishment; and (3) while Mr. Harper did not receive his prescribed fluoxetine from February 3 to February 13, 2011, "Mr. Harper's self-injury was superficial and was *not* the result of missing his *fluoxetine* medication," meaning that the Defendants cannot be liable for deliberate indifference to a serious medical need. (Defs.' Am. Mem. Supp. [67] at 11–15.) I will analyze each claim in turn.

### A.    *Access to the Courts*

The Defendants agree that inmates have a First Amendment right to access the courts and petition the government for redress. (Defs.' Am. Mem. Supp. [67] at 11 (citing *Silva v. Di Vittoria*, 658 F.3d 1090, 1101 (9th Cir. 2011).) Defendants argue that there was no delay in giving Mr. Harper his legal materials, and that even if there was some minimal delay, Mr. Harper

---

[5] The Defendants consistently characterized Mr. Harper's ongoing appellate proceeding during February 2011 as a "post-conviction appeal," but this is inaccurate. Mr. Harper's "Memorandum of Unpreserved Legal Claims" reveals that during 2011, he was engaged in direct appeal from his conviction under Or. Rev. Stat. § 138.040. (Mem. Claims [81] Att. 10 at 1.) Mr. Harper argues that the delay in receiving his legal paperwork during February 2011 rendered him unable to raise eight assignments of error on direct appeal, thus making those arguments procedurally defaulted in later post-conviction proceedings. *See* Or. Rev. Stat. § 138.550; *see also Palmer v. State of Oregon*, 318 Or. 352, 867 P.2d 1368 (1994).

offers no evidence that the delay affected his ability to raise issues in his appellate proceedings, especially considering that Mr. Harper had an attorney. *Id.* 12–13.

Mr. Harper does not allege a First Amendment violation, but rather argues that the Defendants' refusal to grant him access to his legal materials infringed his due process rights.[6] (Compl. [2] at 5.)  An inmate's right of access to the courts is protected under both "the First Amendment right to petition and the Fourteenth Amendment right to substantive due process." *Silva*, 658 F.3d at 1103. It is therefore appropriate to treat Mr. Harper's right of access to the courts claim as implicating both his First Amendment and Fourteenth Amendment rights.

The Ninth Circuit distinguishes access to court claims between "those involving prisoners' right[s] to affirmative *assistance* and those involving prisoners' rights to litigate without active *interference*." *Silva*, 658 F.3d at 1102 (emphasis in original). The right to affirmative assistance is met through the provision of adequate law libraries or adequate assistance from persons with legal training. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). However, a prisoner only has a right to legal assistance when directly or indirectly attacking a sentence or challenging the conditions of their confinement, and the right is limited to the pleading stage. *Lewis v. Casey*, 518 U.S. 343, 355, 384 (1996). On the other hand, the right to be free from interference forbids the states from "erec[ting] barriers that impede the right of access of incarcerated persons." *Silva*, 658 F.3d at 1102–03 (citing, *inter alia*, *Snyder v. Nolan*, 380 F.3d 279, 291 (7th Cir. 2004) (per curiam)). Thus, "prisoners . . . have a right, protected by the First Amendment right to petition and the Fourteenth Amendment right to substantive due process, to pursue legal redress for claims that have a reasonable basis in law or fact." *Id.* at 1103

---

[6] Mr. Harper references both the Fifth Amendment's and the Fourteenth Amendment's Due Process clauses, but in the absence of federal government conduct I will treat his claim as sounding in the Fourteenth Amendment's protection of due process. *See Silva*, 658 F.3d at 1103.

(citations omitted). Unlike the right to adequate assistance recognized in *Bounds*, the right to be free from undue interference extends beyond the pleading stages. *Id.* at 1103.

The Supreme Court's opinion in *Lewis v. Casey*, 518 U.S. 343 (1996), is instructive.[7] There, the Court explained that an access to the courts claim is only colorable upon a showing of actual injury. *Casey*, 518 U.S. at 349. In undue interference cases, the Ninth Circuit has likewise spoken of the need to demonstrate actual injury. *Silva*, 658 F.3d at 1103–04. The *Casey* Court also explained that *Bounds*'s recognition of a right to adequate assistance derived from the fundamental, and antecedent, right to access the courts. *Casey*, 518 U.S. at 354. Thus, cases on which the *Bounds* decision was built sought to protect that right by prohibiting the state from interfering with inmates' attempts to prepare legal documents. *Id.* at 351.

Finally, access to court claims brought against prison officials must be judged within the deferential rubric of *Turner v. Safely*, 482 U.S. 78, 89 (1987), where "a prison regulation impinging on inmates' constitutional rights is valid if it is reasonably related to a legitimate penological interest." Applying this test in *Casey*, the Court found no constitutional violation where Arizona prison regulations resulted in "lockdown" inmates experiencing delays in accessing their legal materials for up to 16 days, even when such delays caused actual injury. *See Casey*, 518 U.S. at 361–62.

In this case, Mr. Harper's allegations are best characterized as an "undue interference" claim, as he alleges that the Defendants violated his right of access to the courts by withholding his legal materials for twenty-three days after his arrival at OSP. (Compl. [2] at 5.) Mr. Harper alleges that he notified the Defendants of "an imminent deadline in the Direct Appeal" of his

---

[7] *Casey* is an "adequate assistance" as opposed to "undue interference" case, but the Court speaks broadly of the entire right of access to the courts.

criminal conviction that was due in February of 2011. *Id.* ¶ 20. As a result of the delay in

accessing his legal work, Mr. Harper was "deprived . . . of the ability to present and litigate eight

(8) errors to the Oregon Court of Appeals." *Id.* at ¶ 21. Defendants contend that the undisputed

facts show that Mr. Harper's first written request for legal materials came on February 10, 2011,

eight days after his reassignment to the DSU.[8] (Defs.' Mem. Supp. [67] at 12.) Inmates in the

DSU must make property requests in writing, and they are provided communication forms and

instructions on how to make such requests. (Etter Decl. [65] ¶¶ 10–11; Attach. 3 at 1–2.)  After

Mr. Harper's first request, Defendants assert that they responded to each successive property

request by, *inter alia*, providing Mr. Harper with his attorney's address and scheduling "legal

assistance" with an inmate paralegal. (Defs.' Mem. Supp. [67] at 12.) Finally, Defendants

contend that because Mr. Harper was represented by counsel in his direct appeal proceedings,

"Plaintiff [has not] established any facts to indicate that any delay actually caused him to lose

eight (8) assignments of error in his [direct] appeal." *Id.* at 13.

### 1.    Interference with Mr. Harper's Access to Legal Materials

As *Casey* teaches, an access to the courts claim must be considered within the deferential

framework of *Turner*. Thus, a policy that caused Arizona inmates to experience a 16-day delay

in receiving their legal materials was constitutionally acceptable, because the policy was

rationally related to a legitimate penological interest. *Casey*, 518 U.S. at 361–62. This case is

different. Mr. Harper is not attacking the validity of the DSU policies themselves, but rather the

Defendants' failure to follow those policies and release Mr. Harper's legal materials after

---

[8] In fact, Mr. Harper delivered a property request on February 9, informing Defendant Lenex that "D.O.C. is keeping my legal property from me." (Etter Decl. [65] Attach. 4 at 1.) Granted, Mr. Harper used a declarative rather than interrogative sentence, but it is unnecessary to be so punctilious about his grammar. It is clear what Mr. Harper meant.

numerous requests.[9] The Defendants contend that there was simply no delay, because "in each

case, the Plaintiff received a response within one day of his request." (Defs.' Mem. Supp. [67] at

12.) Of course, a "response" is not the same as actually providing the requested legal property,

and Defendants' argument relies on reading each of Mr. Harper's requests extremely narrowly—

for example, by construing Mr. Harper's February 10 request to only relate to his attorney's

address, rather than all of his legal paperwork. *Id.*[10] As noted above, Mr. Harper's first written

request concerned his "legal property" in general, and his February 20 request clearly stated "I

still do not have my legal property." (Etter Decl. [65] Attach. 4 at 1, 5.) Viewing the evidence in

the light most favorable to Mr. Harper, the request referenced his attorney to help explain *why* he

needed his property, not to limit the scope of legal materials requested. Assuming Department of

Corrections officials have a legitimate penological interest in restricting the amount and type of

personal property allowed in the DSU, Defendants offer no argument that the failure to follow

such policies likewise serves a legitimate penological interest. Thus, Mr. Harper has raised issues

of disputed fact demonstrating that Defendants' actions cannot be justified under *Casey*'s

application of the deferential *Turner* framework.

## 2.    No Showing of Actual Injury

Even assuming the Defendants' actions are not justified by a legitimate penological

interest, Mr. Harper raises no genuine issues of fact that demonstrate actual injury to a non-

---

[9] Defendants offer somewhat contradictory evidence about the substance of those policies. On the one hand, Defendants contend that DSU inmates must make *written* property requests, and an inmate making a verbal request "would have been instructed to send a written request to the DSU property officer." (Etter Decl. [65] at ¶ 10.) On the other hand, neither the Oregon Administrative Rules nor the "DSU Rules/Guidelines" seem to require that property requests be made in writing. *See id.* Attach. 3 at 1; Or. Admin. R. 291-011-0050.

[10] Mr. Harper's February 10 request read, in part, "I would like to be issued whatever property I have that is DSU approved. At the very least I need my direct appeal lawyers [*sic*] information because I have to keep him updated on my current address." (Etter Decl. [65] Attach. 4 at 2.)

frivolous legal claim caused by the delay. *See Casey*, 518 U.S. at 350–53. A prisoner bringing an undue interference claim must show actual injury. *See, e.g.*, *Silva*, 658 F.3d at 1103–04; *Smith v. Figeroe*, 456 Fed. App'x 694, 695 (9th Cir. 2011). Mr. Harper contends that as a result of the delay, he "was not able to present and litigate errors that occurred during the trial of his criminal convictions to [t]he Oregon Court of Appeals." (Compl. [2] ¶ 13.) In support of this contention, Mr. Harper filed a Memorandum of Unpreserved Legal Claims [81],[11] which includes a copy of his petition for post-conviction relief. Mr. Harper alleges that he notified the Defendants of an "imminent deadline" pending in his direct appeal, and lists eight claims that he would have raised to the Oregon Court of Appeals, but for the delay. (Mem. Claims [81] at 2–3.) The appeal was submitted to the Oregon Court of Appeals on December 14, 2011. *Id.* at 3; *see also State v. Harper*, 251 Or. App. 239, 283 P.3d 408 (2012).[12]

　　　　Mr. Harper's argument is problematic, in two ways. First, he offers no evidence that he was actually barred from including the specified "eight claims" in his post-conviction petition. In fact, many of the allegedly unpreserved claims actually were raised in Mr. Harper's petition for post-conviction relief. *Id.* Attach. 17 (claim that two jurors were biased and should have been removed; claim that trial judge should have recused himself after receiving notice of misconduct report). Second, even assuming that Mr. Harper was procedurally barred from making some arguments in the post-conviction proceeding, he offers no evidence that his failure to raise those issues on direct appeal was *caused by* the delay in receiving his legal materials at OSP. Mr. Harper was represented by counsel during his direct appeal process. (Mem. Claims [81] Attach.

---

[11] Although this memorandum is not accompanied by a sworn declaration, I will treat the memorandum as true for purposes of summary judgment.

[12] The Court of Appeals released its decision on July 18, 2012, ordering a partial remand for resentencing based on the trial court's failure to merge Mr. Harper's conviction on two counts of first degree theft. *See Harper*, 283 P.3d at 409–10).

10 at 1.) Further, correspondence between Mr. Harper and his appellate attorney reveal that the issues that Mr. Harper wanted to raise on appeal were being discussed well before his transfer to OSP (and, as noted above, many were indeed raised at the post-conviction proceeding).[13] Presumably, Mr. Harper's attorney was capable of presenting all relevant assignments of error to the Oregon Court of Appeals. If not, Mr. Harper was free to raise an ineffective assistance of counsel claim in his petition for post-conviction relief, and in fact did just that. *Id.* Attach. 17 at 22–25.[14] Finally, there is simply no evidence regarding the "imminent deadline" itself. Mr. Harper alleges that an important appeals deadline was "due in February," but offers no evidence beyond the pleadings that demonstrates such a deadline actually existed.

Even assuming Mr. Harper has raised genuine issues of fact regarding the Defendants' actions in delaying the provision of his legal property, he has failed to point to any disputed facts demonstrating that the delay caused actual injury to a nonfrivolous legal claim. Thus, the Defendants are entitled to summary judgment on Mr. Harper's access to court claim.

### B.    *Cruel and Unusual Punishment*

Mr. Harper contends that he was subjected to cruel and unusual punishment at the hands of Defendants Polk and Patterson. (Compl. [2] ¶ 23–24.) This claim seems to depend on two related factual circumstances: (1) Defendant Polk issuing Mr. Harper a misconduct report on

---

[13] *See id.* Attach. 13 at 1 (juror Edwin Marvin told jury pool that he recognized Mr. Harper; juror Nicole Anderson went to high school with Mr. Harper; juror Nicole Anderson knew one of the state's witnesses); *id.* Attach. 14 at 1 (state presented insufficient evidence on the identity theft charge; state's evidence contradicted elements of crime of robbery); *id.* Attach. 8 at 1–2 (judicial misconduct complaint filed against trial judge; trial judge was aware of misconduct complaint during trial).

[14] The record does not reveal the disposition of Mr. Harper's ineffective assistance claim, but it is immaterial to the disposition of his claim against Defendants in this case.  Any ineffective assistance by counsel would not show that Defendants were the cause of Mr. Harper's injury; rather—as the record shows—Defendants did not prevent Mr. Harper from communicating the issues he wished to raise on appeal with counsel, and any subsequent failure on counsel's part cannot be imputed to them.

February 2, 2011, for refusing to return to his cell, resulting in a transfer to the DSU; and (2) the February 13, 2011, episode, in which Defendants Polk and Patterson left Mr. Harper unmonitored after allegedly antagonizing and ridiculing him for expressing suicidal thoughts, thus allowing Mr. Harper the opportunity to attempt suicide by biting his wrist. *Id.*

The Supreme Court recently recited the truism that "[p]risoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment." *Brown v. Plata*, 131 S.Ct. 1910, 1928 (2011). The Amendment prohibits more than cruel and unusual sentences; it also prohibits unacceptable conditions of incarceration. Indeed, "harsh 'conditions of confinement' may constitute cruel and unusual punishment unless such conditions 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Here, the issue is not whether alleged harsh conditions of confinement were a part of Mr. Harper's penalty. The issue is whether those conditions occurred at all. According to the sworn statements of Defendants Polk and Patterson, neither of them antagonized or ridiculed Mr. Harper. (Polk Decl. [63] ¶ 10 ("None of that is true."); Patterson Decl. [64] ¶ 7 ("This did not happen.").) Instead, on February 13, 2011, Defendants Polk and Patterson escorted Mr. Harper to a holding area of the DSU after Mr. Harper expressed an interest in self-harm in order to notify the Shift Lieutenant. (Polk Decl. [63] ¶¶ 7–9.) Defendant Polk believed that Mr. Harper was "doing fine" in the holding area, and Defendant Polk did not harbor any animosity towards Mr. Harper. *Id.* ¶¶ 9, 11. Further, the notes taken by Dr. Ruthven during his February 17 session with Mr. Harper reveal that Mr. Harper bit his wrist "so [he] could bleed and let them know how angry [he] was at [Defendant Polk]." (Ruthven Decl. [66] ¶ 7 & Attach. 2 at 39.)

17 – OPINION AND ORDER

Regarding the initial interaction between Mr. Harper and Defendant Polk on February 2, the evidence reveals that Defendant Polk issued Mr. Harper a routine misconduct report for failing to return to his cell. (Polk Decl. [63] ¶ 4; Pl.'s Ex. [2-1] at 8.) The misconduct report led to Mr. Harper being transferred to the DSU, but the evidence shows that the report was "standard procedure" and was not issued out of animosity towards Mr. Harper. (Polk Decl. [63] ¶¶ 4–5.) Beyond the allegations in his complaint, Mr. Harper offers no evidence to contradict the sworn testimony that neither Defendant Polk nor Defendant Patterson antagonized or ridiculed him, or to show that they purposefully left him alone in an unmonitored cell in order to exacerbate his suicidal ideation or prompt him to attempt suicide. Mr. Harper raises no factual issues that could lead a rational jury to find that Mr. Harper suffered cruel and unusual punishment at the hands of Defendants Polk and Patterson. Thus, Defendants are entitled to summary judgment on Mr. Harper's cruel and unusual punishment claim.

### C.    *Deliberate Indifference to Serious Medical Needs*

Mr. Harper argues that the Defendants were deliberately indifferent to his serious medical needs when they failed to dispense his daily dose of fluoxetine from February 3 to February 13, 2011. (Compl. [2] ¶ 24.) This failure in turn led to Mr. Harper's withdrawal from the antidepressant, which in turn contributed to his suicide attempt. *Id.*

An Eighth Amendment violation occurs when prison officials are deliberately indifferent to a prisoner's serious medical needs. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff "must satisfy both the subjective and objective components of a two-part test." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). The objective component requires a plaintiff to show that a prison official deprived the plaintiff of the "minimal civilized measures of life's necessities." *Id.*

(citation omitted). The subjective component requires a plaintiff to show that a prison official acted with deliberate indifference. *Id.*

The objective component requires a demonstration of a deprivation that is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). In the context of medical care, "a serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (internal citations omitted). However, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotation omitted).

A prison official acts with deliberate indifference, and satisfies the subjective component, when "the [official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002). Thus, the official must "be aware of facts from which the inference could be drawn that a serious risk of harm exists," and the official "must also draw the inference." *Farmer*, 511 U.S. at 837. "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (alteration and citation omitted), *overruled on other grounds WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Mr. Harper's claim fails on both prongs of the deliberate indifference inquiry. First, Mr. Harper offers no facts that demonstrate a "sufficiently serious" deprivation of medical care, such that he was subjected to "further significant injury or the unnecessary and wanton infliction of

pain." *Clement*, 298 F.3d at 904 (internal citations omitted). Mr. Harper contends that

"[w]ithdrawals from not getting his daily antidepressant for more than 10 consecutive days"

contributed to his "complete mental breakdown and suicide attempt on February 13, 2011."

(Compl. [2] at 9.) Evidence in the record indicates otherwise. First, Dr. Ruthven notes that the

consequences of missing two weeks of fluoxetine "is minimal and would not create suicidal

ideation." (Ruthven Decl. [66] at ¶ 7.) Further, Mr. Harper told Dr. Ruthven that he had no

perceived benefit from the antidepressant, and Mr. Harper did not mention that he had not been

receiving his fluoxetine. *Id.* ¶¶ 8, 10. Finally, Mr. Harper told Dr. Ruthven that he bit his wrist

out of anger, not because he was suicidal. *Id.* Attach. 2 at 39.

Second, Mr. Harper fails to satisfy the subjective component. Indeed, the complaint

seems to allege that *all* of the individually-named Defendants were deliberately indifferent and

somehow played a role in failing to provide the daily fluoxetine.[15] Mr. Harper did send a

communication form to Defendant Lenex on February 9, stating "I'm not getting my weekly

treatment and for whatever reason they stopped me from getting my fluoxotine [*sic*]." (Etter

Decl. [65] Attach. 4 at 1.) However, there is no evidence that Defendant Lenex was in a position

to correct this problem or that Defendant Lenex knew of a grave risk of harm. In any event, Mr.

Harper began receiving his fluoxetine on February 14, five days later. (Ruthven Decl. [66] ¶ 6.)

Even assuming that Mr. Harper faced an excessive risk of harm from missing approximately two

weeks' worth of fluoxetine, there is simply no evidence that any of the Defendants knew of yet

disregarded that risk. *See Gibson*, 290 F.3d at 1187–88. Indeed, with the possible exception of

Defendant Lenex, I find it doubtful that any of the Defendants—correctional officers and the

---

[15] Dr. Ruthven himself is not a defendant, and none of the named defendants are part of the OSP medical
staff.

superintendent of the prison—even knew that Mr. Harper was prescribed fluoxetine. In the absence of any genuine issues of material facts, the Defendants are entitled to summary judgment on Mr. Harper's deliberate indifference claim.

## CONCLUSION

Because no genuine issues of material fact exist as to whether the Defendants violated Mr. Harper's constitutional rights, Mr. Harper's motion for summary judgment [24] is DENIED and the Defendants' motion for summary judgment [61] is GRANTED.

IT IS SO ORDERED.

DATED this __28__ day of March, 2014.

/s/Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge